IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JAMES DILLON, on Behalf of Himself and All Others Similarly Situated, | )<br>)<br>) |
| Plaintiff, | ) Case No. 16-mc-5-CVE-TLW |
| | ) (Original M.D.N.C. No. 1:13-cv-897) |
| vs. | ) |
| BMO HARRIS BANK, N.A., FOUR OAKS BANK & TRUST, a North Carolina Chartered Bank, GENERATIONS FEDERAL CREDIT UNION, and BAY CITIES BANK, a Florida State-Chartered Bank, | )<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | ) |

## OPINION AND ORDER

Before the Court is non-party The Otoe-Missouria Tribe of Indians' ("the Tribe") Motion to Quash the Subpoena of John Shotton and/or for Protective Order. (Dkt. 3). Defendant BMO Harris Bank has served a subpoena on John Shotton, Chairman of the Tribe and Secretary/Treasurer of Great Plains Lending LLC ("Great Plains"), which is wholly-owned by and serves as an economic arm of the Tribe.[1] Id. BMO Harris subpoenaed Shotton to testify to the authenticity of loan documents produced in the underlying litigation. (Dkt. 3-1). The Tribe asserts that the subpoena should be quashed because the Tribe and, by extension, Great Plains have sovereign immunity; thus, Shotton cannot be compelled to testify. (Dkt. 3). BMO Harris

---

[1] Counsel entered an appearance on behalf of Great Plains, but the Tribe is the movant on the motion to quash. Counsel has stated that the Tribe and Great Plains are essentially a single entity with respect to the issue of tribal sovereign immunity. For purposes of this motion, the Court will reference the Tribe only, as any tribal sovereign immunity belonging to Great Plains flows from the Tribe itself.

argues that Shotton waived the tribe's immunity by signing, for use in the underlying litigation, declarations regarding the authenticity of the loan documents. (Dkt. 7).

## BACKGROUND

Plaintiff sued BMO Harris and the other named defendant banks in connection with payments made "to collect on 'payday loans' in states that have made payday loans unlawful." (Dkt. 7-2). Plaintiff allegedly applied for and received a payday loan from Great Plains, giving Great Plains authorization to debit his checking account in installments to repay the loan. (Dkt. 7-2 at ¶ 81). BMO Harris processed the payments on plaintiff's loan through the Automated Clearing House ("ACH") network. Id. at ¶¶ 82-83.

BMO Harris now seeks to enforce an arbitration agreement contained in the loan contract between plaintiff and Great Plains. (Dkt. 7). As part of the discovery process on the arbitration issue, Shotton, in his capacity as Secretary/Treasurer for Great Plains, submitted two declarations, one dated April 3, 2014, and one dated June 5, 2015. (Dkt. 7, 7-5, 7-6). The first declaration relates to a payday loan issued to plaintiff on December 10, 2012, and the second declaration relates to both the December 2012 payday loan and a second payday loan issued to plaintiff on August 17, 2013. (Dkt. 7-5, 7-6). The second declaration also outlines the debits, which Great Plains initiated to obtain payment on the loans, along with the current status of both loans. Id. The declarations state that the loan agreements contain arbitration provisions and include copies of the agreements, at least according to Shotton. Id. Plaintiff has testified that he does not remember seeing arbitration provisions in the loan applications. (Dkt. 7-7).

The District Court judge presiding over the underlying litigation has determined that Shotton's declarations are likely insufficient to authenticate the loan agreements. Id. In an Order dated January 11, 2016, the District Court judge stated that, although Shotton's declarations state

2

that he "would" testify if called as a witness, Shotton subsequently asserted tribal sovereign immunity and refused to be deposed by plaintiff. Id. The assertion of tribal sovereign immunity, the District Court judge found, "raises questions as to whether . . . Mr. Shotton's declarations are truthful and whether [he has] personal knowledge to support [his] declarations. Overall, the evidence as to authenticity of these [] purported agreements is of questionable admissibility and even more questionable credibility." Id. The District Court judge noted that "click-wrap" documents, like the payday loan applications, "pose special risks of fraud and error." Id. The court set an evidentiary hearing for the purpose of authenticating the documents and stated that she would require testimony from a witness who could properly authenticate the Great Plains loan document and that failure to do so "will likely result in a finding that the purported loan document is inadmissible, at least until and unless the plaintiff relies on that document." Id.

BMO Harris then attempted to secure Shotton's presence at the hearing. Id. When counsel for Shotton stated that he would not be able to attend the hearing "due to scheduling conflicts," BMO Harris served the subpoena at issue. (Dkt. 7, 7-8).

In response, the Tribe filed its motion to quash, asserting tribal sovereign immunity with respect to the subpoena and arguing that Shotton may not provide testimony with respect to the loan agreement because the Tribe has not waived sovereign immunity. (Dkt. 3).

## PROCEDURAL HISTORY

The Court heard argument on the motion to quash on January 26, 2016. (Dkt. 8). During the hearing, counsel for the Tribe requested the opportunity to file a reply brief. Id. The Court allowed the briefing and set the deadline for that afternoon, to be followed by another hearing shortly after the filing deadline. Id. At the second hearing, the Court heard additional argument. (Dkt. 10). Because the evidentiary hearing in the underlying action was set for the following

morning, the Court decided that it would withhold a decision on the motion to quash until after the hearing. Id. The Court set a status conference for the following afternoon. Id.

During the status conference the following day, the parties reported that the evidentiary hearing was ongoing. (Dkt. 14). The parties also requested the opportunity to submit additional briefing, which the Court granted. Id. The parties subsequently submitted a joint status report, in which they stated that the District Court Judge had determined that "the evidentiary hearing on the authenticity of Mr. Dillon's loan agreements would be left open for so long as it took her to enter a written order." (Dkt. 11). The District Court Judge also indicated that any deposition held "within 10 days, or prior to her issuance of a written order," would be considered in her ruling. Id.

Both the Tribe and BMO Harris submitted supplemental briefing on January 29, 2016. (Dkt. 12, 13).

## ANALYSIS

In November of last year, the Tenth Circuit addressed the scope of tribal sovereign immunity:

> Because the Nation is considered a sovereign government, it is immune from suit absent congressional abrogation or a clear waiver by the Nation. N. Arapaho Tribe v. Harnsberger, 697 F.3d 1272, 1281 (10th Cir. 2012); see also Kiowa Tribe of Okla. v. Mfg. Techs., Inc., 523 U.S. 751, 754 (1998). The Nation's sovereign immunity extends to its subdivisions, Native Am. Distrib. v. Seneca–Cayuga Tobacco Co., 546 F.3d 1288, 1292 (10th Cir. 2008), as well as to its tribal officers "so long as they are acting within the scope of their official capacities." See Crowe & Dunlevy, P.C. v. Stidham, 640 F.3d 1140, 1154 (10th Cir. 2011). In other words, "tribal immunity protects tribal officials against claims in their official capacity." Fletcher v. United States, 116 F.3d 1315, 1324 (10th Cir. 1997). But "[a]n Indian tribe's sovereign immunity does not extend to an official when the official is acting as an individual or outside the scope of those powers that have been delegated to him." Burrell v. Armijo, 456 F.3d 1159, 1174 (10th Cir. 2006) (quotations omitted).

Sanders v. Anoatubby, 2015 WL 7423038, *2 (10th Cir. November 23, 2015). A "suit," for purposes of application of tribal sovereign immunity, includes third-party subpoenas served on a tribe. See Bonnet v. Harvest (U.S.) Holdings, Inc., 741 F.3d 1155, 1159-60 (10th Cir. 2014) (reasoning that "tribes are immune from 'suit' under Kiowa, 'suit' includes 'judicial process under Murdock [United States v. Murdock Mch. & Eng'g Co. of Utah, 81 F.3d 922 (10th Cir. 1996)], and a subpoena duces tecum is a form of judicial process under Becker [Becker v. Kroll, 494 F.3d 904(10th Cir. 2007)].").[2]

Again, Indian tribes are "not subject to suit in a federal or state court unless the tribe's sovereign immunity has been either abrogated by Congress or waived by the tribe." Nanomantube v. Kickapoo Tribe in Kansas, 631 F.3d 1150, 1152 (10th Cir. 2011) (citing Miner Elec., Inc. v. Muscogee (Creek) Nation, 505 F.3d 1007, 1009-10 (10th Cir. 2007)). Further, when a tribe does choose to waive sovereign immunity, that waiver "must be unequivocally expressed." Native Am. Distrib., 546 F.3d at 1293.

BMO Harris does not dispute that the Tribe is generally entitled to sovereign immunity from a third-party subpoena. (Dkt. 7). BMO Harris argues, however, that Shotton waived the Tribe's right to assert tribal immunity with respect to the topics contained in his declarations by submitting the declarations for use in the underlying litigation and stated in those declarations that he "could and would testify" to the facts contained therein. Id. The Tribe counters that Shotton's waiver, to the extent he waived tribal sovereign immunity, was invalid because

---

[2] The Tenth Circuit left open the question of "whether a tribal official is also immune from an appropriate federal discovery request" in situations where the official is served with a third-party subpoena that simply seeks relevant information in a tribe's possession and does not involve any action or inaction of the tribe. Bonnet, 741 F.3d at 1161 (citing Alltel Commc'ns, LLC v. DeJordy, 675 F.3d 1100, 1103-06 (8th Cir. 2012). That circumstance does not exist in this case, as the Tribe issued one of the payday loans cited in the Complaint in the underlying litigation. (Dkt. 7-7). Accordingly, the Tribe is not simply in possession of relevant evidence.

Shotton did not have authority to waive the Tribe's immunity and because the Tribe has not waived immunity pursuant to tribal law. (Dkt. 3, 12).

In support of its argument, BMO Harris cites three cases in which the reviewing courts found a waiver of sovereign immunity after the Tribe voluntarily participated in litigation in some way: United States v. James, 980 F.2d 1314 (9th Cir. 1992); Knox v. United States Dept. of the Interior, 2012 WL 465585 (D. Idaho, February 13, 2012); and United States v. Velarde, 40 F.Supp.2d 1314 (D.N.M. 1999). (Dkt. 7).

In James, a criminal defendant served a subpoena on the Quinault Indian Nation seeking "documents related to the victim's alleged alcohol and drug problems" and records "related to disturbances resulting from the victim's occupancy of a Housing Authority residential unit." James, 980 F.2d at 1319. The tribal nation's Department of Social and Health Services and Housing Authority, respectively, had possession of those documents. See id. The Ninth Circuit noted that the tribe was "an uninvolved witness" that happened to be "the holder of possibly relevant documents." Id. at 1320. In that circumstance, the tribe was entitled to tribal sovereign immunity. See id. The Ninth Circuit found, however, that the tribe had waived its tribal sovereign immunity with respect to the Housing Authority documents sought by the criminal defendant because it had previously provided similar, relevant documents to the prosecution. See id. The Court held that the tribe "cannot selectively provide documents and then hide behind a claim of sovereign immunity when the defense requests different documents from the same agency." Id. The tribe's sovereign immunity remained intact, however, with respect to the documents from the Department of Social and Health Services because the tribe's interest in protecting those documents was different from its interest in protecting the documents from the Housing Authority. See id.

6

In Knox, the Shoshone and Bannock Tribes sought to prevent the depositions of three tribal officers in their official capacity. See Knox, 2012 WL 465585 at *1. The trial court had previously determined that the tribes could not be added as defendants due to tribal sovereign immunity. See id. The trial court noted that the tribal members, as individuals, were not protected by sovereign immunity, so plaintiffs could conduct the depositions, but without a waiver of sovereign immunity with respect to their official duties, the depositions would be limited to "factual matters concerning these three men in their individual capacity." See id. However, the tribes had asked for, and been granted, the opportunity to file an amicus brief, and the amicus brief included declarations from the three men regarding their official duties. See id. Applying the Ninth Circuit's reasoning in James, the district court found that, by inserting themselves into the litigation through an amicus brief and the accompanying declarations, the tribes had given a limited waiver of sovereign immunity. See id. The district court ruled that it would compel the depositions of the three tribal officials "to answer questions limited to matters relevant to the contents of the Declarations they filed in this case." Id. at *2.

In Velarde, the Jicarilla Apache Tribe sought to quash subpoenas from both the prosecution and defense in a criminal case involving sexual abuse of a child. Velarde, 40 F.Supp.2d at 1315. The case was being prosecuted under The Indian Major Crimes Act, 18 U.S.C. § 1153, which "provides federal courts with exclusive jurisdiction over fourteen serious crimes when they are committed by an Indian on Indian land." Id. The information requested in the subpoenas included some information that tribal police and census officials had previously disclosed to federal officials and new information that had not yet been produced. See id. at 1315, 1317. The district court conducted an abrogation analysis of the previously undisclosed information and found that it was discoverable, despite the tribe's claim of sovereign immunity.

7

See id. at 1315-16. More importantly, with respect to the previously disclosed documents, the district court applied the reasoning in James and determined that the tribe had waived sovereign immunity. The district court held that "[t]he prior disclosures were made by tribal police and census officers, as well as the tribal president. All of these individuals had lawful access to, and control of, the information *and the authority* to release that information to the Government." Id. at 1317 (emphasis added).

BMO Harris relies on James, Knox, and Velarde to argue that the disclosures made in Shotton's declarations qualify as a waiver of the Tribe's sovereign immunity. The underlying facts of these cases are similar to the facts at issue here in many respects. In James and Velarde, tribal agencies and officials voluntarily provided documents to the Government before asserting a claim of tribal sovereign immunity. In Knox, the tribes asserted their sovereign immunity to avoid being named as defendants but then inserted themselves into the litigation as *amicus curiae*. In the instant case, Shotton, who was both Chairman of the Tribe and Secretary/Treasurer of Great Plains, voluntarily submitted the declarations just as the agencies and officials in James, Knox, and Velarde did. In addition, Shotton promised to make himself available to testify and then failed to do so.

However, there are distinctions to be drawn as well. Both James and Velarde dealt with subpoenas issued in connection with criminal cases for crimes committed on tribal land. In those cases, the courts were required to balance the issue of tribal sovereign immunity against the constitutional rights of a criminal defendant. The courts were also dealing with tribes who had willingly turned over relevant information to a prosecutor but refused to give similar relevant information to a criminal defendant. This case, on the other hand, involves civil litigation, which has much lower stakes and does not impact the constitutional rights of any of the parties. In

Knox, the tribes successfully claimed sovereign immunity when plaintiffs attempted to name them as defendants to the lawsuit but then inserted themselves into the litigation as *amicus curiae*. In this case, plaintiffs have not attempted to name the Tribe and the Tribe has not attempted to join the litigation, but it is not a disinterested party either.

In all three cases, the courts appear to have relied on principles of equity, finding that the tribes should not be able to "selectively" assert tribal sovereign immunity. Perhaps the courts were driven by principles of fairness because in each instance, the court found an *express* waiver of sovereign immunity based on the *apparent* authority of the tribal agencies or officers who had disclosed the information. See James, 980 F.2d at 1320 (Housing Authority's voluntary disclosure constituted an express waiver); Velarde, 40 F.Supp.2d at 1317 (tribal police, tribal census officers, and the tribal president's voluntary disclosure of documents and interviews to federal officials constituted an express waiver); Knox, 2012 WL 465585 at *1 (tribal gaming officials expressly waived tribal sovereign immunity by voluntarily submitting declarations to the court with the tribe's *amicus* brief). In Velarde, the district court specifically rejected the tribe's argument that the prior disclosures were unauthorized, finding that "[a]ll of these individuals had lawful access to, and control of the information and the authority to release that information to the Government." Velarde, 40 F.Supp.2d at 1317. But the Velarde court did not explain how it arrived at the conclusion that tribal police and census officers had the authority to waive the tribe's sovereign immunity.

The similarities between these cases and the instant case tempt the Court to adopt the reasoning in James (and Knox and Velarde) and find that the Tribe "cannot selectively provide documents and then hide behind a claim of sovereign immunity." James, 980 F.2d at 1320. The equities of such a finding are compelling.

9

Nonetheless, this Court is bound by the Tenth Circuit's and the Supreme Court's strict interpretation of the express waiver requirement, and the Tenth Circuit does not appear to permit a waiver of tribal sovereign immunity based upon apparent authority. In cases where the United States Supreme Court or the Tenth Circuit has found a waiver of tribal sovereign immunity, such waiver is usually in the form of a valid contract or a tribal resolution. See, e.g., C&L Enters., Inc. v. Citizen Band Potawatomi Indian Tribe of Oklahoma, 532 U.S. 411, 418, 121 S.Ct. 1589, 149 L.Ed.2d 623 (2001) (contract); Merrion v. Jicarilla Apache Tribe, 617 F.2d 537, 540 (10th Cir. 1982) (tribal council resolution). Similarly, in Breakthrough Mgmt. Grp., Inc. v. Chuckchansi Gold Casino & Resort, 629 F.3d 1173, 1193 (10th Cir. 2010), where a tribe intended for its economic development arm to have the authority to waive tribal sovereign immunity, the tribe's governing council passed an ordinance expressly defining the scope of that authority and the format of any such waiver.

By way of contrast, even documents that purport to adopt state or federal law, without more, do not constitute a waiver of tribal sovereign immunity. See Nanomantube, 631 F.3d at 1152; E.F.W. v. St. Stephen's Indian High School, 264 F.3d 1297, 1304-05 (10th Cir. 2001) (holding that agreeing "to act in accordance with state law to some degree and in essence to adopt state law is simply not an express waiver of [] tribal sovereignty"). In Nanomantube, a former employee of a tribal casino argued that he should be able to sue the tribe for employment discrimination under Title VII, based upon the casino's employee handbook, which stated that the casino would comply with the provisions of Title VII. 631 F.3d at 1152-53. The Tenth Circuit rejected the argument, even though the handbook was an official document of the tribe. See id. at 1153. The Court held that the tribe's agreement to comply with Title VII, "with no reference to any forum where this agreement could be enforced," likely created some

10

"ambiguity" in light of Title VII's "jurisdictional and enforcement provisions." Id. The Court found, however, that "this ambiguity falls well short of creating an unequivocal expression of waiver" and concluded that "the Tribe's agreement to comply with title VII, like similar agreements to comply with other federal statutes, may 'convey a promise not to discriminate,' but it 'in no way constitute[s] an express and unequivocal waiver of sovereign immunity and consent to be sued in federal court.'" Id. (quoting Sanderlin v. Seminole Tribe of Fla., 243 F.3d 1282, 1289 (11th Cir. 2001)).

Nanomantube and other Tenth Circuit cases in which a tribe expresses, through a written document, a promise to be bound by the confines of state or federal law provide the closest analogy to the facts here. Shotton's declarations appear to be officially sanctioned because Shotton is both Chairman of the Tribe and the Secretary/Treasurer of Great Plains. He is cloaked with the apparent authority to speak for the tribe, just as an employee handbook represents the policies of a tribal employer. The declarations do not state, however, that Shotton is empowered to waive sovereign immunity, even for the limited purpose of authenticating the loan documents. The Tribe asserts that Shotton did not have authority to waive tribal sovereign immunity; if that assertion is true, the declarations themselves do not qualify as an express waiver of sovereign immunity. At best, the declarations establish that Shotton had implied authority to waive the tribe's sovereign immunity, but implied authority is not sufficient to constitute a waiver. See Santa Clara Pueblo v. Martinez, 436 U.S. 49, 58, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978) (stating that waiver of tribal sovereign immunity "cannot be implied but must be unequivocally expressed"). To support its assertion, the Tribe has submitted evidence, in the form of its Limited Liability Codes, that any waiver of tribal sovereign immunity would require "[a] resolution adopted by the Board of Directors of the Tribal LLC for the specific purpose of granting a

11

waiver." (Dkt. 3-1). Counsel for the Tribe has also represented to the Court and testified that no such resolution was passed. (Dkts. 8 and 10, Hearing, Saba Bazzazzieh; Dkt. 12-1).

Based on these facts, and despite the inequity which results, the Court cannot find that there was a clear, unequivocal waiver of tribal sovereign immunity. See Merrion, 617 F.2d at 540 (holding that effective waiver must be consistent with tribal law); Winnebago Tribe of Nebraska v. Kline, 297 F.Supp.2d 1291, 1303-04 (D.Kan. 2004) (citation omitted) (same).

In its surreply, BMO Harris additionally argues that Shotton has waived his personal immunity, arguing that "the *Tribe's* immunity from suit is not in question, but rather *Mr. Shotton's* immunity from answering follow-up questions on a topic covered by his declarations." (Dkt. 13) (emphasis in original). It is true that an individual's status as a member of a tribe does not bestow sovereign immunity on that individual. See Tenneco Oil Co. v. Sac and Fox Tribe of Indians of Okla., 725 F.2d 572, 576 n.1 (10th Cir. 1984); Native Am. Distrib., 547 F.3d at 1296. However, tribal sovereign immunity extends to individuals to the extent they are operating within the scope of their authority as officers of the tribe. See Stidham, 640 F.3d at 1154. Acting within the scope of an officer's authority does not mean she or he has express permission from the Tribe to take whatever action is at issue. See Burrell v. Armijo, 456 F.3d 1159, 1174 (10th Cir. 2006). Likewise, simply because an officer is acting without permission, or contrary to the manner in which a tribe desires, does not mean she or he is acting outside the scope of her or his authority. Rather, an officer acts outside the scope of authority when ". . . acting outside the amount of authority that the sovereign is capable of bestowing. . . ." Id.; see also Burlington N.R. Co. v. Blackfeet Tribe, 924 F.2d 899, 902 (9th Cir. 1991) (a tribe's immunity extends to officials "acting in their representative capacity and within the scope of their valid authority").

Here, counsel for the Tribe initially indicated that Mr. Shotton had acted outside the scope of his authority as an officer of Great Plains when he signed and submitted the declarations. (Dkt. 10, Hearing, Saba Bazzazzieh). However, in her declaration, counsel changed directions and testified that Shotton did, in fact, sign the declarations "in his capacity as Secretary/Treasury [sic] of Great Plains" and that he acted outside the scope of his authority only on the matter of the waiver of tribal sovereign immunity. (Dkt. 12-1). As the discussion above makes clear, however, the Tribe's changing position does not alter the result. Although BMO Harris may have the right to depose Shotton in his individual capacity, his knowledge of the loan agreements exists only because of his official position within the Tribe as Secretary/Treasurer of Great Plains, and his sovereign immunity with respect to the loan documents has not been waived because he was acting within the scope of authority that the Tribe could lawfully provide him. See, e.g., Knox, 2012 WL 465885 at *1; United States v. Wahtomy, 2008 WL 4690519, *1 (D. Idaho October 22, 2008) (acknowledging that individual tribal members have no sovereign immunity but quashing subpoenas seeking testimony from four tribal members because the subject of the testimony sought related to their work as tribal officers and was not limited to questioning the members as fact witnesses); United States v. Kaufman, 980 F.Supp.127 (S.D.Fla. 1997) (quashing a subpoena issued to a federal judge because, although the party pursuing the subpoena claimed to seek testimony regarding statements the judge heard in his individual capacity, those statements were actually made during the course of a court proceeding).

Accordingly, Shotton cannot be required to give deposition testimony regarding the loan documents because he only has access to that information in his official capacity as Secretary/Treasurer of Great Plains.

**CONCLUSION**

For these reasons, the Court finds that the Tribe has not waived sovereign immunity with respect to the loan agreements at issue in Shotton's declaration. While the Court recognizes that this ruling may hinder BMO Harris in the underlying litigation, the "well-established doctrine" of tribal sovereign immunity cannot be abridged, even if application of the doctrine "works some inconvenience, or even injustice." <u>Alltel</u>, 675 F.3d at 1106. Therefore, the Tribe's Motion to Quash (dkt. 3) is **GRANTED**.

SO ORDERED this 4th day of February, 2016.

_____
T. Lane Wilson
United States Magistrate Judge